## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| LARRY WINFREY, | |
| *Plaintiff,* | |
| vs. | Case No. 14-CV-1034-EFM-JPO |
| HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY and GROUP LONG TERM DISABILITY PLAN FOR EMPLOYEES OF SPIRIT AEROSYSTEMS, INC., | |
| *Defendants.* | |

### MEMORANDUM AND ORDER

Plaintiff Larry Winfrey brings suit against Hartford Life and Accident Insurance Company and Group Long Term Disability Plan for Employees of Spirit Aerosystems, Inc. (collectively "Hartford") for recovery of benefits under a disability insurance policy. Before the Court are two motions for summary judgment: one by Winfrey and the other by Hartford. Because the Court finds that Hartford did not abuse its discretion in denying Winfrey long-term disability benefits, the Court grants Hartford's Motion for Summary Judgment (Doc. 43) and denies Winfrey's Motion for Summary Judgment (Doc. 52).

# I.    Factual and Procedural Background[1]

Plaintiff Larry Winfrey was previously employed as a Marketing and Sales Customer Service Representative at Spirit Aerosystems, Inc., where he began working in January 2006. Winfrey described his position as involving forecasting, reporting, and computer work.  The physical demands of his position included the use of a computer, calculator, and telephone; frequent reaching at desk level; occasional reaching at waist and above shoulder level; sitting throughout the day with brief periods of standing and/or walking; and no lifting.

In 2007, Winfrey had a laminectomy at the L4-L5 vertebrae in his back. In May 2010, Winfrey was diagnosed with failed spine surgery syndrome, bilateral lumbar radiculitis, and status post L4-L5 laminectomy.  In October 2011, Winfrey underwent a psychological evaluation by Don Morgan, Ph.D., to determine his suitability for an implanted spinal stimulator trial. During the evaluation, Winfrey told Dr. Morgan that he experiences pain from sitting and that he uses a TENS unit at work to help with pain.  Winfrey ultimately did not have the spinal stimulator surgically implanted after the trial.

In November 2011, a MRI confirmed that Winfrey has lumbar degenerative disc disease even after his 2007 laminectomy.  Winfrey continues to experience pain despite undergoing surgical procedures, physical therapy, external electrical simulation, implanted neural stimulators, and medications.

---

[1] In accordance with the summary judgment standard, the Court sets forth the facts as they are related in the light most favorable to the non-moving party.  In reference to the administrative record, the Court appreciates that both parties cited to the nine sets of documents provided at Docket 45.  These documents, however, span over 800 pages, and neither party provided an exhibit index for the Court to reference when looking at them.  For future reference, the Court reminds the parties of Local Rule 7.6(b) which requires the filing party to "separately label any exhibits attached to motion briefs or memoranda and *file an index of such exhibits*." D. Kan. R. 7.6(b) (emphasis added).

**Spirit's Short-Term Disability and Long-Term Disability Plans**

Hartford issued Group Insurance Policy No. GLT-696984 to Spirit, which insures Spirit's welfare benefit plan.  The policy contains a short-term disability plan ("STD Plan") and a long-term disability plan ("LTD Plan").  The STD Plan is self-funded, meaning that Hartford administers the plan but Spirit pays out the disability benefits, while the LTD Plan is both administered and paid out by Hartford.  Because the LTD Plan is primarily at issue in this case, the Court will outline its terms below.

Pursuant to the LTD Plan, the term "Disability" or "Disabled" means

You prevented from performing one or more of the Essential Duties of:

1) Your Occupation During the Elimination Period;

2) Your Occupation for the 24 month(s) following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and

3) after that, Any Occupation

"Essential Duty" means "a duty that is substantial, not incidental; is fundamental or inherent to the occupation; and cannot be reasonably omitted or changed."  The LTD plan defines the term "Your Occupation" as "Your Occupation: as it is recognized in the general workplace; and for which [the claimant is] qualified by education, training or experience."  The LTD plan defines the term "Elimination Period" as "the longer of the number of consecutive days at the beginning of any one period of Disability which must elapse before benefits are payable or the expiration of any Employer sponsored short term Disability benefits or salary continuation program, excluding benefits required by state law."  Under the LTD Plan, Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions" of the policy.

**Winfrey's Short Term Disability Claim**

On September 12, 2012, Winfrey submitted a claim under the STD Plan due to low back pain and radicular neuropathic pain. That same day, Hartford faxed an Attending Physician's Statement ("APS") to Plaintiff's treating physician, Dr. Scott Meyers. Dr. Meyers returned the APS to Hartford on September 18, 2012. It stated that Winfrey was unable to work for three months. Hartford approved Winfrey's STD application based upon Dr. Meyers' APS and began paying benefits under the Policy on September 13, 2012, which would expire on October 24, 2012.

On October 15, 2012, Hartford sent Dr. Meyers another APS to determine the progression of Winfrey's capabilities. Winfrey also contacted Hartford on that day, stating that he believed he would be able to return to work on November 15, 2012. On October 17, 2012, Dr. Meyers returned the APS listing a return to work date of December 13, 2012, and the following restrictions: no working, standing, lifting, sitting, carrying, bending, and kneeling. Hartford approved the continuation of Winfrey's STD benefits through November 14, 2012.

On November 19, 2012, Winfrey contacted Hartford asking to further extend his STD benefits. That same day, Dr. Meyers submitted an updated APS listing a return to work date of December 13, 2012, and the following restrictions: no standing, lifting more than ten pounds, sitting, carrying, bending, kneeling for over two hours. Winfrey also contacted Hartford on November 20, 2012, and stated that his back pain was improving and that he could sit longer than he used to with a new patch and exercise. On December 4, 2012, Hartford faxed another APS to Dr. Meyers, who responded on December 6, 2012, with the same restrictions and listing a return to work of January 2, 2013. Hartford then approved the continuation of Winfrey's STD benefits through December 12, 2012.

Hartford contacted Winfrey for additional information on December 12, 13, and 17, 2012, to review continuing his benefits past December 12, 2012.  On December 26, 2012, a clinical case manager with Hartford sent Dr. Meyers a request for additional information regarding Winfrey's capabilities and medical condition.  The case manager noted that Winfrey was having gradual improvement but was not yet able to sit for a full day.  The case manager also noted that Winfrey had indicated that he had planned to return to work on December 15 but would rather go out of town for Christmas break then return to work in January.  The case manager asked Dr. Meyers if the restrictions he had given Winfrey were based on Winfrey's subjective complaints of inability to sit for a full work day, and Dr. Meyers confirmed that they were.  Hartford approved the continuation of Winfrey's STD benefits through January 6, 2012.

Winfrey returned to work on January 7, 2013, but only worked for about a week.  After receiving notice from Winfrey that he needed continuing benefits, Hartford sent Dr. Meyers another APS.  On January 18, 2013, Dr. Meyers listed Winfrey's restrictions as no standing, lifting more than ten pounds, carrying, kneeling, no sitting for more than two hours without getting up.  He also stated that these restrictions were permanent. On January 22, 2013, Winfrey called Hartford and stated that he could not work anymore due to his pain.  Hartford thereafter extended Plaintiff's STD benefits to March 30, 2013.

**Winfrey's Long Term Disability Claim**

On February 7, 2013, the Hartford employee handling Winfrey's STD claim referred the claim to Hartford's LTD department.  On February 13, 2013, Hartford notified Winfrey that if he remained out of work past the duration of his STD benefits, he would need to file for LTD benefits.  The next day, Winfrey submitted a claim for long-term disability.

As part of its initial investigation, Hartford contacted Winfrey's two most-current treating physicians, Dr. Meyers and Dr. Brock McKay.  On March 1, 2013, Dr. Meyers completed an APS, which reported a primary diagnosis of degenerated lumbar disc and a secondary diagnosis of post laminectomy syndrome.  The APS also reported physical exam findings of tenderness in the lumbosacral region and a limited range of motion.  Dr. Meyers listed Winfrey's restrictions as: "[n]o bending, lifting, twisting, standing, sitting."

On March 14, 2013, Hartford sent a letter to Dr. Meyers stating that "[a]fter review of the medical records the records do not support the level of functionality on the recent Attending Physician Statement you completed on 3/1/2013.  In order to assist Larry back to his sedentary level work setting, clarifications are needed."  The letter also stated "[p]lease provide medical information, i.e. recent MRI's etc. to support your responses."  Dr. Meyers answered the questions on March 15, 2013, as follows:

> In your medical opinion, does Larry have the ability to sit for 2 hour bouts for 8 hours per day with stand and walk only required occasionally as reflected in a sedentary level work setting on a full time basis?
>
> *No.  [H]e has increasing pain when he attempts to sit for that long a period of time.*
>
> In your medical opinion, does Larry have the ability to occasionally lift/carry up to 10 lbs, reach above shoulder level and below waist as reflected in a sedentary level work setting on a full time schedule?
>
> *No.  [H]e has increasing pain when he attempts to do so.*
>
> In your medical opinion, does Larry have the ability to reach frequently at desk level and frequent finger/handle as reflected in a sedentary level work setting on a full time schedule?
>
> *No.  [B]ecause he cannot sit at the desk where the activity would be done.*

Unsatisfied with Dr. Meyers' response, Hartford referred Winfrey's file to MES Solutions for clarification regarding Winfrey's medical conditions and functional abilities.[2]  Dr. Jennifer Weiss, a board certified physician in orthopedic surgery who was employed by MES Solutions, performed a peer review of the medical records received from Dr. McKay and Dr. Meyers.   In her report, Dr. Weiss noted that "[t]he accompanying records provide no substantiation to provide limitations in sitting, standing or walking in prolonged timeframes.  It is my opinion that there is no documentation that precludes the claimant from performing a sedentary job."   The report also stated that "[n]otes from 9/5/12 to 3/1/13 consistently note normal neurological exams."

Dr. Myers received a copy of Dr. Weiss' report and responded to Hartford with the following comments:

> In regard to her comments about the office notes that she had been reviewing, I am somewhat confused by those comments.  Mr. Winfrey has problems with neuropathic pain in his legs arising from lumbar back problems.  His limiting factor for working is the exacerbation of his pain that occurs when he attempts to work.  His pain if untreated is too severe for him to function cognitively and if treated with sufficient pain medication he is then too sedated to function cognitively.   My confusion lies with Dr. Weiss' conclusion that normal neurological exams prove that he is not disabled.  I am not aware of any physical exam findings on neurological exam that would be abnormal in a patient that is having neuropathic pain.  Of course it would be possible to develop motor weakness, DTR changes, atrophy, etc. with his problem, but I don't think the absence of those findings allows one to conclude that he is not having neuropathic pain.  Therefore, I would expect that the neurological examination would often be normal in a patient with his condition.

Hartford reviewed Dr. Meyers' letter and determined on April 17, 2013, that Dr. Meyers had not provided "additional medical and/or objective findings" to support the level of functionality he

---

[2] MES Solutions received hundreds of thousands of dollars per year from Hartford from 2010 through 2013 for conducting file reviews.

had attributed to Winfrey.  On April 22, 2013, Hartford denied Winfrey's LTD claim concluding that Winfrey did not satisfy the Policy's Own Occupation definition of "Disability."

Winfrey appealed the decision on October 18, 2013.  With the appeal, Winfrey submitted medical records documenting his ongoing back problems and treatments, an opinion letter from Dr. Meyers, and written statements from his wife and two friends.  On November 5, 2013, Winfrey notified Hartford that the Social Security Administration determined that he would receive monthly disability benefits beginning March 2013.

Hartford sent Winfrey's file to Managing Claims Managing Care ("MCMC") for a file review.[3]  Its website states that MCMC offers investigative services to its customers, including surveillance, web based investigation, and litigation support.  The website also has the image of a shark swimming through water that serves as a mascot for the Investigative Services division.

Dr. Susan Rosenfeld, a physician board certified in psychiatry, reviewed Winfrey's claim from a psychological perspective.  As part of her assessment, Dr. Rosenfeld spoke with Dr. McKay, who stated he had not seen Winfrey since June 2013.  Dr. McKay told Dr. Rosenfeld that he did not believe Winfrey's mental health condition would have caused impairment that would require restrictions or limitations at work.  He said that he believed the main issue was the back pain and that Winfrey wanted to work and would have been working if not for the pain.  Dr. Rosenfeld ultimately concluded that although Winfrey did have some mild psychiatric symptoms, the clinical evidence did not support any psychological conditions that would have been of the severity to be functionally impairing.

---

[3] MCMC also received hundreds of thousands of dollars from Hartford from 2011 to 2013.

Hartford also sent Winfrey's file to Dr. Steven Lobel, a board certified physician in physical medicine, rehabilitation, and pain medicine.  As part of his review, Dr. Lobel spoke with Dr. Meyers, who stated that he did not think Winfrey could work because of his inability to stay in one position for any length of time.  Dr. Meyers also reported that the side effects of Winfrey's pain medications caused too much sedation and that he felt Winfrey did not have malingering behaviors.

Dr. Lobel's report states that based on the medical documentation, while Winfrey shows some tenderness and reduced range of motion, he had intact motor and sensory function.  He also reported that any restrictions or limitations due to pain were not supported and were inconsistent with the clinical findings.  Dr. Lobel further noted that although Dr. Meyers said Winfrey experiences side effects from his pain medications, the medical record did not show any cognitive deficit or any alteration to his medication regimen due to cognitive deficit.  Ultimately, Dr. Lobel concluded that Winfrey was capable of full-time employment with certain restrictions, including but not limited to:  sitting for up to 30 minutes at one time (then stand and stretch for one minute) up to eight hours in a workday; standing and walking combined up to 20 minutes at a time for up to two hours per workday; occasional bending, twisting, overhead reaching occasionally when in supported sitting (chair with back and armrests); and waist level reaching may be done on a frequent basis.

On December 18, 2013, Hartford issued a letter to Winfrey denying his claim for LTD benefits.  In addition to addressing Winfrey's medical documentation, the MES file review, and the MCMC file review, the denial letter addressed Winfrey's Social Security award.  With regard to that award, the letter states as follows:

> While we note that Mr. Winfrey was approved for Social Security disability benefits, please be advised, it is possible for an individual to qualify for Social Security Disability (SSD) benefits, but no longer continue to qualify for private-long term disability (LTD) benefits from The Hartford because the standards governing these private and public benefits are different in critical ways. . . . For example, the SSA uses age as a primary factor in determining whether to award SSD and treat advancing age as an increasingly limiting factor in worker's ability to adjust to other work. The Hartford does not use age in assessing if a claimant meets its LTD policy's definition of Disability, in large part because age should not limit an individual's capacity to work from a functional standpoint. Therefore, while The Hartford considers the SSA disability determination as one piece of relevant evidence, the SSA determination is not conclusive. However, we have indeed carefully considered all relevant medical and vocational evidence provided in determining your client's claim.

Hartford ultimately concluded that "[w]hile it is appreciated and understood that [Winfrey] may likely have some limitations to his activity, the weight of the evidence supports his capacity to perform at least full-time sedentary work such as his occupation with the Employer as a Customer Service Representative."

Having exhausted his administrative remedies, Winfrey brought this action under § 502(a) of ERISA on December 31, 2013, seeking to enforce his rights to benefits under the policy. Winfrey originally filed this case in Kansas state court, and Hartford removed it to the United States District Court for the District of Kansas on January 24, 2014. The parties subsequently filed cross-motions for summary judgment, which are ripe for the Court's determination.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[4] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the

---

[4] Fed. R. Civ. P. 56(c).

proffered evidence permits a reasonable jury to decide the issue in either party's favor.[5]   The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[6]   If the movant carries this initial burden, the nonmovant that bears the burden of persuasion at trial may not simply rest on its pleading but must instead "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.[7]   These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[8]   The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[9]

Though the parties in this case filed cross-motions for summary judgment, the legal standard remains the same.[10]   Each party retains the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law.[11]   Each motion will be considered separately.[12]   To the extent the cross-motions overlap, however, the court may address the legal arguments together.[13]   Finally, summary judgment is not a "disfavored

---

[5] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[6] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[7] *Id.* (citing Fed. R. Civ. P. 56(e)).

[8] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[9] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[10] *City of Shawnee v. Argonaut Ins. Co.*, 546 F. Supp. 2d 1163, 1172 (D. Kan. 2008).

[11] *United Wats, Inc. v. Cincinnati Ins. Co.*, 971 F. Supp. 1375, 1381-82 (D. Kan. 1997) (citing *Houghton v. Foremost Fin. Servs. Corp.*, 724 F.2d 112, 114 (10th Cir. 1983)).

[12] *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

[13] *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010).

procedural shortcut," but is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' "[14]

### III.    Analysis

### A.    Standard of Review

A district court reviews a denial of benefits under a *de novo* standard "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[15]   If the plan administrator has discretion to determine eligibility for benefits and to construe plan terms, then the court reviews the administrator's actions under a " '*deferential standard* of review.' "[16]   Under this standard, a court reviews the administrator's decision for an abuse of discretion.[17]   The LTD Plan in this case gives Hartford full discretion and authority to determine eligibility for benefits and construe the plan terms.  Therefore, the Court will apply the abuse of discretion standard.

The abuse of discretion standard and arbitrary and capricious standard are interchangeable in this context, and thus, the Tenth Circuit applies the arbitrary and capricious standard to the plan administrator's determination.[18]   Under this standard, "review is limited to determining whether the interpretation of the plan was reasonable and made in good faith."[19] The decision of the plan administrator will be upheld "so long as it is predicated on a reasoned

---

[14] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 1989)).

[16] *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (quoting *Firestone*, 489 U.S. at 111).

[17] *Foster v. PPG Indus., Inc.*, 693 F.3d 1226, 1231 (10th Cir. 2012) (citing *Firestone*, 489 U.S. at 115).

[18] *Id.*

[19] *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1130 (10th Cir. 2011) (quotations omitted).

basis," and "there is no requirement that the basis relied upon be the only logical one or even the superlative one."[20]   The Court looks for "substantial evidence" in the record to support the administrator's conclusion.[21]   Substantial evidence is "more than a scintilla but less than a preponderance."[22]   "The substantiality of the evidence must be evaluated 'against the backdrop of the administrative record as a whole.' "[23]

A court's review under the arbitrary and capricious standard is influenced by an inherent conflict of interest when the claims administrator acts in the dual role of evaluator and payor of the claim.[24] When this occurs, the Tenth Circuit applies "a combination-of-factors" method of review "that allows [judges] to take account of several different, often case-specific, factors, reaching a result by weighing it all together."[25]   A conflict "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . [and] should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy."[26]

---

[20] *Id.* at 1134 (quotations omitted).

[21] *Berges*, 704 F. Supp. 2d at 1175.

[22] *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992) (quotation omitted).

[23] *Berges*, 704 F. Supp. 2d at 1175 (quotation omitted).

[24] *Glenn*, 554 U.S. at 112.

[25] *Holcomb v. Unum Life Ins. Co.*, 578 F.3d 1187, 1193 (10th Cir. 2009) (internal quotation marks and alterations omitted) (citing *Glenn*, 554 U.S. at 117).

[26] *Glenn*, 554 U.S. at 117.

**B.      Review of Hartford's Denial of Benefits**

Winfrey contends that Hartford abused its discretion in denying his claim for LTD benefits.  In support of his argument, Winfrey points to several instances in the record that it believes shows that Hartford's conflict of interest drove the denial of his claim.  He also argues that Hartford erroneously required objective proof of his pain, did not consider the non-exertional limitations of his position, and did not consider his Social Security Award in denying him benefits.  Hartford, on the other hand, denies that a financial conflict influenced its benefits decision and contends that its decision to deny benefits was within its discretion and thus should be affirmed.

Winfrey alleges the following six bases for finding that Hartford's final decision denying him LTD benefits was arbitrary and capricious.

**1.      Hartford's Financial Conflict of Interest**

Hartford acted as administrator and payor of the LTD Plan at issue here.  Therefore, the Court is required to weigh the resulting conflict in its abuse of discretion analysis.  Winfrey contends that the Court should weigh this conflict heavily because of the "mutually exclusive positions" Hartford took with regard to his disability.  Winfrey claims that Hartford determined he was disabled under the STD Plan, which it was not required to pay benefits under, but later determined that he was not disabled under the LTD Plan, which it was required to pay benefits under, during the exact same time period.  According to Winfrey, "[t]he only difference between the circumstances between the first decision (STD) and the second (LTD) is that Hartford had no financial conflict of interest with respect to the STD benefits."

In response, Hartford argues that Winfrey can't raise this argument before the Court because he did not make it during the administrative appeal process.  Hartford relies on the Tenth

Circuit's decision *Sandoval v. Aetna Life and Casualty Insurance Co.*[27] where the circuit held that "[i]n determining whether the plan administrator's decision was arbitrary and capricious, the district court generally may consider only the arguments and evidence before the administrator at the time it made that decision."[28]   *Sandoval*, however, is distinguishable from this case.   In *Sandoval*, the circuit held that the district court exceeded its scope of review when it found the plaintiff totally disabled based on evidence that was not submitted to the defendant insurance company's review committee.[29]   Here, Plaintiff is not relying on evidence that was not submitted to Hartford during the administrative appeal process.   Instead, it is arguing that Hartford's change of position with regard to Winfrey's disabled status is a "red flag" that requires the Court to weigh Hartford's financial conflict more heavily.   Winfrey's argument relates solely to this Court's review of Hartford's decision and is not even one he could have raised during his appeal. Therefore, the Court will consider Winfrey's argument even though he did not make it to Hartford during the administrative appeal process.

Winfrey claims that the only difference between the circumstances of Hartford's STD decision and LTD disability decision is that Hartford had no financial conflict of interest with respect to the STD benefits.   The Court disagrees.   As Hartford points out, Dr. Meyers' opinion regarding Winfrey's condition and ability to work changed significantly over the period of time he received STD benefits.   From September 30, 2012, to January 7, 2013, when Winfrey

---

[27] 967 F.2d 377 (10th Cir. 1992).

[28] *Id.* at 380.   More recent Tenth Circuit opinions indicate that the circuit's holding in *Sandoval* might be open to a different result.   *See Farr v. Hartford Life & Acc. Ins. Co.*, 322 F. App'x 622, 628 (10th Cir. 2009) ("[W]e have, accordingly, applied a rule barring ERISA claims that were not previously pursued administratively (i.e., claim exhaustion). But we have not extended this rule to bar subsidiary arguments urged on judicial review in support of a claim itself fully exhausted in the administrative process (i.e., issue exhaustion)."); *Forrester v. Metropolitan Life Ins. Co.*, 232 F. App'x 758, 762 (10th Cir. 2007).

[29] *Sandoval*, 967 F.2d at 380.

returned to work, Dr. Meyers reported that Winfrey's condition was improving and that he would be able to return to work. It was not until Winfrey returned to work and then left again that Dr. Meyers opined that he likely would not be able to return to work.

Furthermore, Dr. Meyers' opinion regarding Winfrey's restrictions and limitations changed when he applied for LTD benefits. As late as January 18, 2013, Dr. Meyers listed Winfrey's restrictions as "no standing, lifting >10 lbs, carrying, kneeling, no sitting > 2 hours without getting up to walk." However, on March 1, 2013, two weeks after Winfrey applied for LTD benefits, Dr. Meyers listed Winfrey's restrictions as "no bending, lifting, twisting, standing, sitting." As much as Winfrey would like to portray his STD and LTD claims as involving the same limitations and restrictions, this is not the case. Dr. Meyers' opinion regarding Winfrey's restrictions and limitations changed throughout his claims.

The approval of short term disability benefits does not guarantee or otherwise indicate that a claimant is entitled to an award of long-term disability benefits. The Court does not find that Hartford took a "mutually exclusive" opinion regarding Winfrey's disability. Therefore, while the Court considers Hartford's inherent conflict on this basis, it declines to weigh it heavily.

Winfrey also argues that the Court should weigh the financial conflict heavily because Hartford hired file review companies with known biases. In support of this bias, Winfrey points to the fact that MES and MCMC receive hundreds of thousands of dollars per year from Hartford and that MCMC advertises that it offers services to insurance companies designed to "dig up dirt" about claimants and a "RESULTS"-oriented investigative service represented by a shark. Winfrey contends that by hiring these companies to review his file, Hartford demonstrated that its financial conflict took precedence over Hartford's duties to Winfrey.

-16-

The Court finds Winfrey's argument unpersuasive.  Neither the fact that Hartford paid MES and MCMC for their reviews or that MCMC advertised investigative services for its clients is evidence of bias in this case.  In fact, the Tenth Circuit has recognized that retaining independent physicians (defining "independent as not including a plan administrator's own on-site physicians and nurses") actually decreases the significance of a plan administrator's conflict of interest.[30]  Accordingly, the Court finds that any conflict of interest Hartford may have had in reviewing Winfrey's claim to be minimal.

### 2.        Hartford's Requirement of Objective Proof of Pain

Winfrey contends that Hartford unfairly determined that Winfrey did not substantiate his pain with sufficient objective evidence to support Dr. Meyers' restrictions.  In support of his argument, Winfrey first points to Hartford's summary judgment brief, in which it states that Winfrey provided "objective exam findings" to support his STD claim. Specifically, Winfrey references the note Hartford's case manager entered on the claim log on January 25, 2013, reflecting that Dr. Meyers had provided objective exam findings.  Winfrey claims that this "objective evidence" is representative of all other documents submitted in connection with his LTD claim.  According to Winfrey, those documents were objective enough for Hartford to conclude that he was disabled under the STD Plan but not under the LTD Plan, and this shift in analysis is indicative that Hartford's financial conflict of interest impacted his LTD benefits determination.

The Court disagrees.  Hartford's notes show that it did not extend Winfrey's STD benefits based solely on Dr. Meyers' objective findings but on Winfrey's own reported

---

[30] *Rizzi v. Hartford Life and Acc. Ins. Co.*, 383 F. App'x 738, 750 (10th Cir. 2010) (quotations and alterations omitted) (citing *Holcomb*, 578 F.3d at 1193).

symptoms. Although Dr. Meyers stated he did not expect Winfrey's condition to improve, his January 18, 2013 APS report did not place restrictions on Winfrey that were inconsistent with his job requirements ("no standing, lifting > 10 lbs carrying, kneeling, no siting for more than 2 hours without getting up to walk"). And, at that time, no independent physician had reviewed Winfrey's medical records. Thus, the Court does not consider Hartford's statement that Winfrey provided "objective evidence" with regard to his STD claim to be indicative of the fact that its financial interest drove its analysis of Winfrey's LTD claim.

Winfrey further contends that Hartford's dismissal of his pain as subjective was improper. In support of this argument, Winfrey cites *Gaylor v. John Hancock Mutual Life Insurance Co.*,[31] but his reliance on this case is misplaced. In *Gaylor*, the Tenth Circuit held that the insurance company abused its discretion in denying LTD benefits to the claimant because the claimant's "physical condition could not be verified by the use of clinical and laboratory diagnostic techniques" and the insurance company's own physician agreed with the claimant's treating physician.[32] Here, neither party asserts that Winfrey's post-laminectomy syndrome cannot be verified by the use of clinical and laboratory diagnostic techniques. Furthermore, none of the independent physicians who reviewed Winfrey's file agreed with Dr. Meyers' analysis. Therefore *Gaylor* is distinguishable to this case.

The Court is "permitted to consider subjective, as well as objective, evidence of a plaintiff's disability in ERISA cases."[33] However, "neither the plaintiff's own word nor [the]

---

[31] 112 F.3d 460 (10th Cir. 1997).

[32] *Id.* at 467.

[33] *Niles v. Am. Airlines, Inc.*, 563 F. Supp. 2d 1208, 1219 (D. Kan. 2008) (citing *Ray v. UNUM Life Ins. Co. of Am.*, 224 F. App'x 772, 786-87 (10th Cir. 2007)).

treating physician's word is conclusive."[34]   In this case, Hartford reviewed and considered Winfrey's subjective reports of pain.  Both Dr. Weiss and Dr. Lobel reviewed Winfrey's and Dr. Meyers' reports and statements.  Dr. Weiss and Dr. Lobel then compared the medical evidence against the subjective reports and ultimately concluded that there was no objective evidence to support Winfrey's report of disabling pain.

The reviewing physicians also addressed Winfrey's claim that his pain medication made him unable to work.  Dr. Rosenfeld conducted a review of Winfrey's claim from a psychological perspective and noted in her review that she considered Winfrey's pain medications and that Winfrey's treating physicians had reported that his "[b]ehavior [was] noted to be normal and cognition [was] intact."  Dr. Rosenfeld also contacted Dr. McKay who stated that he did not believe that Winfrey's mental health condition would have caused impairment that would require restrictions at work.  Finally, Dr. Lobel reported that he spoke with Dr. Meyers regarding Plaintiff's condition and medication but that the medication side effects were subjectively reported by Dr. Meyers and there was no support in the medical documentation of any cognitive deficit or alteration to his medication regimen due to cognitive deficit.

The Plan at issue here gives Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions" of the Policy.  It requires Winfrey to provide evidence to support his claims of disability and requires that such evidence be satisfactory to Hartford.  Winfrey has not submitted sufficient evidence to show that Hartford arbitrarily disregarded the opinions of his treating physicians or his complaints of pain.

---

[34] *Id.*

Therefore, the Court finds that Hartford did not abuse its discretion in finding that Winfrey's complaints of pain were not supported by objective medical evidence.

### 3.    Hartford's Failure to Conduct an Independent Medical Examination

Winfrey argues that Hartford abused its discretion by not ordering an in-person Independent Medical Examination ("IME") of Winfrey given that his claim involves disabling pain.   An IME provides an examination similar to that of a claimant's treating physician. Hartford's policies state that an IME "should be considered the first type of Independent Opinion to request when attempting to clarify functionality."  They further state that

> [i]f an IME is not the appropriate vendor resource based on the claim specifics, a Medical Consultant (MC) review or Functional Capacity Evaluation (FCE) may be requested including but not limited to, when:
>
> -The medical review is retrospective only; records must be of good quality and complete.
> -An evaluation of medical record(s) for medical care and treatment of Pre-existing Conditions is applicable to the claim.
> -A physician Specialty match is not available for an IME due to geographic issues
> -AA or clinical staff has been unable to secure a consensus or functionality with multiple treating physicians.

When a LTD claim is appealed, Hartford's policies require a records review, not an IME, if the attending physician's assessment differs from Hartford's initial determination.

Winfrey argues that Hartford's failure to order an in-person examination is significant for two reasons.  First, he asserts that it is suspect for an insurance company to favor a file review when the claim involves subjective issues like pain.  Winfrey relies on two cases in support of this argument—*Calvert v. Firstart Finance, Inc.*,[35] and *Eaton v. Metro Life Insurance Co.*[36]  But, neither of these cases is binding on this Court or persuasive.  *Calvert* holds that "we find nothing

---

[35] 409 F.3d 286 (6th Cir. 2005).

[36] 661 F. Supp. 2d 1240 (E.D. Okla. 2009).

inherently objectionable about a file review by a qualified physician in the context of a benefits determination."[37]   Furthermore, unlike this case, the reviewer in *Calvert* made conclusory statements without reviewing or referencing the records provided to him.[38]

*Eaton* is factually different from this case.   In *Eaton*, the plan administrator did not conduct an IME because the administrator's own physician told it that an IME would validate the claim of disability.[39]   This fact specifically influenced the Court's decision.[40]   Here, Hartford opted to have board certified physicians review the claim after it determined that further review was required.

Second, Winfrey asserts that Hartford's decision is significant because it "violated its own policies in choosing an impersonal file review over an IME."[41]   Although Hartford's policies state that an IME should be the first type of Independent Opinion requested, they also state that a medical consultant review or functional capacity evaluation may be obtained when an IME is not the appropriate vendor resource based on claim specifics.   Here, Winfrey has not provided sufficient information for the Court to conclude that Hartford violated its policies by obtaining a medical consultant review instead of an IME.   Winfrey does not even mention the circumstances set forth in Hartford's policies stating when a medical consultant review or

---

[37] 409 F.3d at 296.

[38] *Id.*

[39] 661 F. Supp. 2d at 1252-53.

[40] *Id.* at 1253.

[41] Hartford contends that Winfrey should not be allowed to argue that Hartford abused its discretion with regard to the IME because he did not raise this argument during his administrative appeal. At that time, however, Winfrey had no way of knowing what Hartford's policies were regarding conducting an IME, a medical consultant review, or a functional capacity evaluation.  Therefore, the Court considers Winfrey's arguments on the issue.

functional capacity exam may be the first type of Independent Opinion requested. Therefore, the Court does not find that Hartford abused its discretion by obtaining a file review instead of an IME.

### 4. Hartford's Consideration of the Non-Exertional Demands of Winfrey's Job

Winfrey next asserts that Hartford abused its discretion by ignoring the non-exertional demands of his job. Winfrey's job duties included forecasting, reporting, and computer work; developing and implementing marketing strategies and action plans; and working with people and processes to promote the sale of products and services. Winfrey contends that Hartford's file reviewers ignored these demands and focused solely on sitting.

The Court disagrees. In her review of Winfrey's records, Dr. Weiss noted that she had reviewed all of Winfrey's medical records and self-reported statements of functionality. Dr. Meyers' sole statement regarding Winfrey's cognition was in his response to Dr. Weiss' report, in which he stated that Winfrey's pain, if untreated, was too severe for him to function cognitively, and if treated with sufficient pain medication, would result in such sedation that he could not function cognitively.

On administrative appeal, Dr. Rosenfeld spoke with one of Winfrey's treating physicians, Dr. McKay, who told him that Winfrey's mental health condition was not so severe that it would have caused impairment requiring limitations at work. Dr. Rosenfeld thereafter concluded that the clinical evidence did not support any psychological conditions that would have been of the severity to be functionally impairing.

Dr. Lobel also prepared a report that specifically included an assessment of Dr. Meyers' statement about Winfrey's pain and treatment. Specifically, Dr. Lobel found that there were no side effects, cognitive deficit, or alteration due to Winfrey's pain medication that were

documented in the record; that the psychiatry report noted that Winfrey was distracted but with intact cognition when examined; and that Dr. Lobel spoke with Dr. Rosenfeld who indicated no support for psychiatric impairment, restrictions, or limitations.  Based on these reports, the Court concludes that Hartford more than adequately addressed the non-exertional limitations of Winfrey's position.

### 5.     Hartford's Treatment of Winfrey's Social Security Award

Winfrey claims that Hartford arbitrarily handled his Social Security award.  According to Winfrey, Hartford claims that it considers the award in making the benefits determination but the only time it addressed the award is in the denial letter with "canned language."  According to Winfrey this conduct is another example of Hartford placing its interests ahead of Winfrey's and is additional evidence of an abuse of discretion.  In response, Hartford argues that Winfrey's argument is not supported by the record.

A review of the record shows that Winfrey's argument is flawed.  The document Winfrey cites in support of his argument that Hartford uses "canned language" when referring to Social Security awards states that "[a]n SSD award is a factor to be considered before terminating a claimant's LTD benefits."  The document goes on to provide a paragraph that the reviewer must include "to any letter where LTD benefits are being terminated because the claimant does not satisfy the Definition of Disability and Social Security Disability benefits have been awarded." Here, the paragraph that Winfrey cites to appears to apply in the context of terminating LTD benefits, not in the determination of whether benefits should be awarded in the first place. Furthermore, even if Hartford does include the cited paragraph in its benefit denial letters, the language in Hartford's denial letter to Winfrey is different.  Hartford provides an additional

explanation in its letter that is not found in the "canned" paragraph.  Specifically, Hartford states that

> the SSA uses age as a primary factor in determining whether to award SSD and treat advancing age as an increasingly limited factor in worker's ability to adjust to other work.  The Hartford does not use age in assessing if a claimant meets its LTD policy's definition of Disability, in large part because age should not limit an individual's capacity to work from a functional standpoint.

Winfrey even acknowledges this language in his motion for summary judgment when he states that Hartford "disregarded the favorable Social security award in the final benefit denial because of Winfrey's age."  Thus, Hartford did not solely use the canned language in its denial letter.

Finally, the only case law Winfrey has cited in support of this argument is *Metropolitan Life Insurance Co. v. Glenn*,[42] which is distinguishable from the facts here.  In *Glenn*, the Supreme Court found that MetLife acted unreasonable in terminating the claimant's LTD benefits when it encouraged the claimant to apply for Social Security benefits, received the bulk of the benefits from the claimant's Social Security award, and then ignored the Social Security Administration's finding that the claimant could do no work.[43]  Here, however, Hartford is not terminating LTD benefits that have already been granted to Winfrey.  It is making the initial determination about whether Winfrey should receive them.  More importantly, it never benefitted from Winfrey's receipt of Social Security benefits.  Therefore, Winfrey's reliance on *Glenn* is misplaced.  The Court finds that Hartford did not abuse its discretion with regard to its treatment of Winfrey's Social Security award.

---

[42] 554 U.S. 105 (2008).

[43] *Id*. at 118.

-24-

C.      **Conclusion**

Having reviewed the administrative record, the Court finds that Hartford's decision to deny Winfrey's claim for disability benefits was not arbitrary and capricious.  Rather, the record contains sufficient facts to show that Hartford's decision was reasonable and based on substantial evidence in the record.  Finally, the Court finds that the conflict of interest created by Hartford's dual role as administrator and insurer had minimal impact and did not drive Hartford's benefit determination.  For these reasons, the Court denies Winfrey's Motion for Summary Judgment and grants Hartford's Motion for Summary Judgment.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Doc. 43) is **GRANTED**.

**IT IS FURTHER ODERED** that Plaintiff's Motion for Summary Judgment (Doc. 52) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 28th day of August, 2015.


*Eric F. Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE